# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| MILDRED ANN SIMS,<br>as Personal Representative of<br>of the Estate of WICKIE<br>YVONNE BRYANT, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF ATLANTA,<br>GEORGIA; PATRICK L. LABAT,<br>Chief, Office of Corrections for the<br>Atlanta City Detention Center;<br>MAJOR LECOUNTE, Facility<br>Commander for the Atlanta City<br>Detention Center; EDGAR<br>SCOTT, III, M.D., Medical<br>Director/Health Authority;<br>KATHY BRAWNER, R.N.,<br>Director of Nursing for Inmate<br>Medical Services; YVIKA<br>MITCHELL, R.N., Nursing<br>Supervisor; LPNs:  AMITRA<br>MATHIS, AUDREY MOSES,<br>AMELIA PEARSON, IVAN L.<br>HAYWOOD, JANICE SMITH,<br>and JENNIFER GLENN; and<br>Security Officers:  LIEUTENANT<br>MARNITA TRAVIS, OSCILLIA<br>ADAMS, MARIAN BULLARD-<br>WHITAKER, TAMIKO FRASER,<br>and NILMA SANDERS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____<br><br>JURY TRIAL DEMANDED<br><br><u>COMPLAINT</u> |

## **COMPLAINT**

Plaintiff Mildred Ann Sims, as the Personal Representative of the Estate of Wickie Yvonne Bryant, Deceased, through her undersigned attorneys, files this Complaint against Defendants the City of Atlanta, Georgia; Patrick L. Labat, Chief, Office of Corrections for the Atlanta City Detention Center; Major LeCounte, Facility Commander for the Atlanta City Detention Center; Edgar Scott, III, M.D., Medical Director/Health Authority for the Atlanta City Detention Center; Kathy Brawner, former Director of Nursing for Inmate Medical Services for the Atlanta City Detention Center; Yvika Mitchell, R.N., Nursing Supervisor for the Atlanta City Detention Center; Atlanta City Detention Center LPNs: Amitra Mathis, Audrey Moses, Amelia Pearson, Ivan L. Haywood, Janice Smith, and Jennifer Glenn; and Atlanta City Detention Center Security Officers: Lieutenant Marnita Travis, Oscillia Adams, Marian Bullard-Whitaker, Tamiko Fraser, and Nilma Sanders, and shows the Court as follows:

## **NATURE OF THE ACTION**

1.     This case presents claims relating to the cruel and unusual treatment, demonstrating deliberate indifference to serious medical conditions, and culminating in the death of 55-year-old Wickie Yvonne Bryant, Mildred Ann Sims' sister, from diabetic ketoacidosis at the Atlanta City Detention Center

(sometimes called the "jail"). Ms. Bryant was a pretrial detainee. Due to the Defendants' deliberate indifference, Ms. Bryant died alone in an unlit cell, where her body remained for several hours before anyone even noticed that she died. Ms. Bryant suffered from serious mental and physical health issues, including schizophrenia, bipolar disorder, diabetes and hypertension, all of which known to the jail's medical and correctional staff. When Ms. Bryant entered the jail on the afternoon of September 14, 2015, she was classified as a minimum-security, mentally-disordered detainee and assigned to the "special needs" section of the jail, known as "4NW." During her intake medical screening, Ms. Bryant's glucose or blood sugar level was extremely high, at 353 mg/dL.

2. According to the City of Atlanta's Department of Correction's Disciplinary Complaint File (the "DOC Investigation File"), Ms. Bryant twice refused administration of insulin during her first two (2) days at the jail. But, despite a purported written policy requiring physician referral if a detainee or inmate refuses medication on two occasions, no one notified a physician.

3. After a few days, oral diabetes medication Metformin was prescribed for Ms. Bryant, to be taken twice daily for fifteen (15) days. But, of the 30 pills prescribed to her, jail medical records indicate that she took approximately three (3) of them. Again, none of the nurses or correctional staff notified a physician

3

that Ms. Bryant had refused her diabetes medication on many more than two (2) occasions, and no one renewed or sought renewal of Ms. Bryant's prescription when it expired after fifteen (15) days.

4.     Despite orders to monitor Ms. Bryant's blood sugar levels by twice-daily tests (for ninety (90) days), and documenting multiple, repeated refusals of those tests, none of the nursing staff notified a physician, and only one nurse ever referred her for further medical attention (though the appointment was flagged as a "routine" one, with a nurse, and no one followed up when Ms. Bryant failed to keep that appointment).

5.     When Ms. Sims visited her sister at the jail during the first week Ms. Bryant was detained, Ms. Sims notified the jail staff that Ms. Bryant had mental health issues as well as diabetes and that Ms. Bryant was non-compliant with her medication.

6.     Ms. Sims pleaded with the jail staff, and demanded that Ms. Bryant receive and take her medication because of serious concerns about her sister's physical and mental health.

7.     The jail staff assured Ms. Sims that Ms. Bryant would receive her diabetes medication, though medication for her mental health would not be

provided for at least fourteen (14) days.  Other than an initial screening, no other mental health assessment or treatment was provided to Ms. Bryant.

8.      On or about October 5, 2015, when Ms. Bryant became agitated, correctional staff, instead of seeking medical or mental-health assistance for her, punitively moved Ms. Bryant from a cell on the first floor, minimum security area of the 4NW area of the jail, which had functioning lights, to a dark cell in the back corner of the second floor of 4NW.  This new cell, located in the maximum-security portion of 4NW, was in an area where the lights had not functioned for years, making it extremely difficult to see detainees, let alone to see them well enough to monitor their health.  That cell move was made without supervisor authorization, and without documenting a reason for the move.  Although the move was recorded in the jail's computer system, the lack of supervisory approval and/or failure to provide a reason for the move, was not addressed until the City of Atlanta's Department of Corrections' investigation following Ms. Bryant's death.

9.      Despite Ms. Bryant's serious mental and physical health conditions and repeated refusals to take medication or permit testing to monitor her blood sugar levels, the medical, supervisory, and correctional staff at the Atlanta City jail were deliberately indifferent to her serious medical needs and the obvious signs that her health and life were in imminent danger.  To-wit, On October 12-13, 2015,

5

Ms. Bryant was unable to eat and had fallen unconscious; she had vomited at least twice before losing consciousness; and she had urinated and defecated uncontrollably.  Notwithstanding Ms. Bryant's obvious emergent medical distress and corresponding extreme discomfort and anguish, Defendants failed to even open her cell to check on her, despite the presence of feces and water on the floor in front of her cell, until another inmate noticed that Ms. Bryant had not eaten lunch or dinner.

10.    This inaction was due, in substantial part, to deficient policies of the City of Atlanta, which failed to implement proper diabetic care protocols, ignored significant mental health issues implicated in medication and treatment refusals that presented serious medical dangers, a failure to provide any mental health treatment whatsoever, and consistently failed to train its medical staff to follow the few policies that were in place and that could have preserved Ms. Bryant's life. Indeed, the City's purported policy of "referring to a physician" the cases of two or more medication refusals is vague, confusing, and interpreted to require the same nurse to document and remember two or more refusals as to that specific nurse, and not as to two overall refusals.

11.    The City of Atlanta also failed to train the jail's non-medical staff to recognize and respond to serious medical conditions associated with diabetic

hyperglycemia or ketoacidosis, failed to implement procedures and supervise and train correctional staff such that policies and procedures regarding moving detainees to different cells were followed, failed to correct a long-known problem with the lights on the second floor of 4NW, permitted Ms. Bryant to be moved there, where she could not be readily observed or her serious health issues monitored, and failed to enforce procedures requiring hourly (or every half-hour) monitoring of detainees.  All of these failures demonstrated deliberate indifference to the health, safety and life of Ms. Bryant, in violation of the Fourteenth Amendment to the United States Constitution.

12.    On the evening of October 13, 2015, after enduring physical and mental torture, Ms. Bryant was found dead in her dark, unlit cell, with sticky floors that smelled of urine, dried vomit on her face, her mattress and on the floor of her cell, lying in the same position she had been in since lunch time the prior day.  Ms. Bryant's arm was stiff when it was first touched, and the medical examiner reported that her body was in full rigor less than an hour after her death was finally discovered, demonstrating that she had been dead for several hours.  An autopsy revealed that Ms. Bryant died from diabetic ketoacidosis.

13.    The logs purporting to record inspection of Ms. Bryant and other maximum security inmates/detainees in the 4NW section of the jail were falsified,

as videotape demonstrated that no one conducted security checks during several timeframes reported on the logs on October 13, 2016.

14.     But for the deliberate indifference of the jail's medical, supervisory and correctional staff to Ms. Bryant's health and safety, including adopting policies and customs that wholly failed to address the serious dangers to Ms. Bryant's health and very life, that failed to provide for sufficient medical supervision of inmates and detainees, and the City's failure to train and supervise employees such that existing policies were understood and enforced, Ms. Bryant's untimely, excruciating death from diabetic ketoacidosis would not have occurred.

15.     Ms. Bryant's sister, as the personal representative of the estate of Wickie Yvonne Bryant, pursues claims under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution in that her sister was subjected to cruel and unusual punishment, via Defendants' deliberate indifference to her serious medical conditions, resulting in mental anguish, pain, suffering, and Ms. Bryant's untimely and wrongful death.

## PARTIES, JURISDICTION AND VENUE

16.     Plaintiff Mildred Ann Sims is a resident and citizen of Fulton County, Georgia.  She brings this lawsuit as the Personal Representative of the Estate of her

sister, Wickie Yvonne Bryant, deceased, to recover for violation of her civil rights and wrongful death.

17.    Defendant the City of Atlanta, Georgia is a municipality in the State of Georgia, located within the Northern District of Georgia.   Through its Department of Corrections, the City of Atlanta owns and operates the Atlanta City Detention Center, located at 254 Peachtree Street, SW, Atlanta, Georgia 30303. The City of Atlanta, and the other named defendants, in their official capacities, can be served with process through Mayor Kasim Reed, 55 Trinity Avenue, Suite 2400, Atlanta, Georgia 30335.

18.    Plaintiff Ms. Sims sues the City of Atlanta, and the medical (including medical supervisory), jail supervisory and correctional staff at its jail for inadequate policies and procedures or customs that caused the deprivation of Wickie Yvonne Bryant's constitutional rights to receive necessary medical treatment to alleviate pain and suffering, to preserve her life, and to be free from cruel and unusual punishment under the Fourteenth Amendment of the United States Constitution.

19.    This Court has federal-question jurisdiction, 28 U.S.C. § 1331, over Plaintiff's civil rights claims, brought under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

20.     This Court has personal jurisdiction over the Defendants because at all relevant times hereto, the City of Atlanta is a municipal subdivision of the State of Georgia, and the named City employees were employed at a facility located in Fulton County, Georgia.

21.     Because the City of Atlanta is deemed to be a resident of this judicial district, and because the events and omissions giving rise to Plaintiff's claims occurred in this judicial district, venue is proper under 28 U.S.C. § 1391(b)(1) and (2).

22.     The requisite *ante-litem* notices have been provided in accordance with O.C.G.A. § 36-33-5(b).

23.     Defendant Chief Patrick L. Labat was, at all relevant times, the Chief of the Office of Corrections for the City of Atlanta.  Defendant Chief Labat is responsible for the overall operation and direction of the Atlanta City Detention Center.  As the Chief of the Office of Corrections for the City of Atlanta, Defendant Chief Labat was responsible for setting and permitting policies and procedures that demonstrated deliberate indifference to the health and life of Ms. Bryant, resulting in the deprivation of her constitutional rights and wrongful death. Defendant Chief Labat can be served in his individual capacity at the Atlanta City Detention Center, 254 Peachtree Street, SW, Atlanta, GA 30303.

10

24.     Defendant Major LeCounte was, at all relevant times, the Facility Commander for the Atlanta City Detention Center.  Major LeCounte oversees the division responsible for the security and care of persons arrested in the City of Atlanta who are awaiting pretrial court proceedings or trial, like Ms. Bryant.  As the Facility Commander for the Atlanta City Detention Center, Defendant Major LeCounte set official policies and procedures that demonstrated deliberate indifference to the health and life of Ms. Bryant, resulting in the deprivation of her constitutional rights and wrongful death.  Defendant Major LeCounte can be served in his individual capacity at the Atlanta City Detention Center, 254 Peachtree Street, SW, Atlanta, GA 30303.  Defendant Chief Labat and Defendant Major LeCounte are sometimes referred to collectively as the "jail supervisory personnel."

25.     Defendant Edgar Scott, III, M.D., was, at all relevant times, the Medical Director/Health Authority for the Atlanta City Detention Center. Defendant Dr. Scott is responsible for the delivery and coordination of health-care services at the Atlanta City Detention Center.   Defendant Dr. Scott's responsibilities include developing mechanisms to assure that the scope of medical services is provided and properly monitored, developing, along with the Director of Nursing, the jail's operational health policies and procedures and establishing

systems for the coordination of care among multidisciplinary health care providers. He is sued in his capacities as Medical Director/Health Authority for the Atlanta City Detention Center for setting and permitting policies and procedures demonstrating deliberate indifference to the health and life of Ms. Bryant, resulting in the deprivation of her constitutional rights and wrongful death and in his individual capacity. Defendant Dr. Scott can be served in his individual capacity at the Atlanta City Detention Center, 254 Peachtree Street, SW, Atlanta, GA 30303.

26.     Defendant Kathy Brawner, R.N., was, at all relevant times, the Director of Nursing for Inmate Medical Services for the Atlanta City Detention Center. Defendant Nurse Brawner was responsible for providing medical and mental health care to detainees and, with the Medical Director, developing the jail's operational health policies and procedures. As the Director of Nursing for Inmate Services for the Atlanta City Detention Center, Nurse Brawner set policies and procedures demonstrating deliberate indifference to the health and life of Ms. Bryant, resulting in the deprivation of her constitutional rights and wrongful death. In her individual capacity, she can be served at: 111 Shamrock Drive, LaGrange, GA 30241.

27.     Defendant Yvika Mitchell, R.N., was, at all relevant times, Nursing Supervisor and the administrator of the Atlanta City Detention Center's electronic

health system called "CorrecTek."  Defendant Nurse Mitchell was responsible for supervising the nurses in the Medical Unit and administering the electronic health system.  She is sued for setting and permitting policies and procedures demonstrating deliberate indifference to the health and life of Ms. Bryant, resulting in the deprivation of her constitutional rights and wrongful death.  Defendant Nurse Mitchell can be served in her individual capacity at the Atlanta City Detention Center, 254 Peachtree Street, SW, Atlanta, GA 30303.

28.     Defendants Dr. Scott and Nurses Brawner and Mitchell are sometimes referred to as the "Medical Supervisory Staff."  Their failures to train the Defendant LPNs and their adoption and utilization of a wholly ineffective written and computerized medical reporting systems set a policy and standard operating procedure in which the LPNs providing medical care and treatment at the jail lacked critical information regarding the medical conditions and treatment history of detainees, including Ms. Bryant, and further set a policy devoid of any reporting mechanism to refer patients in the jail to a physician in regard to medication and treatment refusals by detainees, including Ms. Bryant.

29.     Defendant LPNs Amitra Mathis, Audrey Moses, Amelia Pearson, Ivan L. Haywood, Janice Smith and Jennifer Glenn were, at all relevant times, Licensed Practical Nurses employed by the City of Atlanta Department of

Corrections, working in Health Services for the Atlanta City Detention Center. The Defendant LPNs were assigned to provide medical care to Ms. Bryant. According to the DOC Investigation File, all noted multiple refusals of blood-sugar testing, medication, or both, and none brought these repeated refusals to the attention of any physician or referred Ms. Bryant to a physician. These failures arose, at least in substantial part, from insufficient training and policies and procedures developed by the Medical Supervisory Staff, Defendants Dr. Scott, Nurse Brawner and Nurse Mitchell. The Defendant LPNs can be served in their individual capacities at the Atlanta City Detention Center, 254 Peachtree Street, SW, Atlanta, GA 30303.

30.    Defendant Security Officers Lieutenant Marnita Travis, Oscillia Adams, Marian Bullard-Whitaker, Tamiko Fraser and Nilma Sanders were, at all relevant times, employed as Security Officers assigned to work in the 4NW women's special management unit of the Atlanta City Detention Center, with Defendant Lieutenant Travis serving as a supervisor on the 4NW unit.

31.    Defendant Security Officer Bullard-Whitaker, acting without supervisor approval, moved Ms. Bryant from her fully functional, lit cell (116) in the minimum-security area of 4NW, to cell 202, in a corner of the second floor, in the maximum-security area of 4NW, where the lights had not worked for years.

Defendant Security Officer Fraser, who was not a supervisor, purportedly "approved" the move and entered it into the computer, without providing a reason for the move. Defendant Security Officers Lieutenant Travis, Oscillia Adams, Bullard-Whitaker and Sanders were on duty for the day watch on October 13, 2015, and Defendant Security Officer Sanders entered security rounds in the logs that she did not actually conduct, as revealed by surveillance videotape. The Defendant Security Officers can be served in their individual capacities at the Atlanta City Detention Center, 254 Peachtree Street, SW, Atlanta, GA 30303.

## FACTS

### A. The City, and its jail personnel, were aware of Ms. Bryant's serious physical and mental health issues.

32.    Ms. Bryant was arrested at Atlanta Medical Center on a charge of disorderly conduct. She was detained at the City of Atlanta Detention Center, beginning at approximately 1:00 p.m. on September 14, 2015.

33.    At the jail, Ms. Bryant's intake medical screening identified that she suffered from serious mental and physical health issues, including schizophrenia, bipolar disorder, diabetes and hypertension. Ms. Bryant indicated that she was on medication for diabetes, hypertension and mental disorders.

34.    Ms. Bryant was classified as a minimum-security, but mentally disordered, detainee and assigned to the 4NW "special needs" section of the jail.

15

Ms. Bryant's glucose or blood-sugar level was extremely elevated, at 353 mg/dL, but she refused insulin.

36. There is no indication that this extremely elevated blood-glucose level or Ms. Bryant's refusal to take insulin was reported to a physician. There is also no indication that anyone at the jail conducted a ketone test on Ms. Bryant until after she died.

36. It appears that, other than her initial mental health screening, Ms. Bryant received no further mental health evaluation, treatment, medication or counseling, though she was detained for disorderly conduct for refusing to leave a hospital prior to her arrest, and was classified "mentally disordered" on intake.

37. Ms. Bryant was assigned to cell 116 in the 4NW housing unit; 4NW was purportedly "special management housing" for female detainees.

**B. Ms. Bryant consistently declined treatment, but no mental health professional evaluated her decision-making capacity, and no one ever referred her to a physician, let alone to an outside hospital.**

38. Ms. Bryant refused insulin treatment again on the evening of September 14, 2015, telling the nurse that insulin made her sick and requesting Metformin, an oral medication. Although the jail has a purported written policy requiring the referral of detainees who refuse medication twice or more to a

physician, Ms. Bryant was not referred to a physician by Defendant LPN Nurse Glenn upon her second refusal of insulin.

39.    No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 14, 2015.

40.    On September 15, 2015, Ms. Bryant appeared in the Atlanta Municipal Court, but her court date was re-scheduled to October 20, 2015, and she was returned to the jail.

41.    Ms. Bryant refused a blood-glucose test and diabetic treatment during the afternoon and evening of September 15, 2015.  No other medication or treatment or testing was offered to Ms. Bryant for her known mental-health, diabetes or hypertension issues on September 15, 2015.

42.    On September 16, 2015, Ms. Bryant refused blood-glucose tests in both the morning and evening, explaining in writing that she wanted to see a doctor before taking any medications.  No medication or treatment was offered to Ms. Bryant for her known mental-health, diabetes or hypertension issues on September 16, 2015.

43.    On September 17, 2015, Ms. Bryant refused blood-glucose testing. But she was prescribed Metformin, 500 mg, twice per day for fifteen (15) days, and she took that medication on the evening of September 17, 2015.  No

medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 17, 2015.

44.   On September 18, 2015, Ms. Bryant twice refused blood-glucose testing and missed both doses of Metformin.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 18, 2015.

45.   On September 19, 2015, Ms. Bryant refused her morning blood-glucose testing, and it is not clear whether the jail offered an evening glucose test to her.  It is unclear whether she was offered her Metformin on the morning of September 19, 2015, but it does not appear that it was administered.  She took a dose of Metformin on the evening of September 19, 2015.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 19, 2015.

46.   On September 20, 2015, Ms. Bryant refused her morning and evening "diabetic treatment" – presumably blood-glucose tests.  Ms. Bryant's doses of Metformin for September 20, 2015 are recorded as "missed" in the computerized Medical Administration Records.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 20, 2015.

47.     Also on September 20, 2015, Ms. Bryant submitted a written request that the jail obtain information on her medical condition and records from Atlanta Medical Center, Grady Hospital, and DeKalb Medical Center and requested the medication that had been prescribed to her.   She wrote, "I have psycologocal [psychological] pro[]blems.   I take Prolixin and something for depression.   I used[d] to go for[] with mental ill session.   Was treated there 2 years."   Despite Ms. Bryant's pleas about her psychological problems and history, and despite that Prolixin is an anti-psychotic medication commonly used to treat schizophrenia, the jail simply scheduled her for a "routine" appointment with a nurse – not with a physician or even with a mental health practitioner.   There is no indication that the jail sought Ms. Bryant's medical records or medication history from any outside source, her decision-making capacity was never evaluated by a mental-health professional, and she was never offered any mental-health treatment.

48.     On September 21, 2015, at 3:30 a.m., Ms. Bryant refused her blood-glucose test.   It is unclear whether a blood-glucose test was offered that evening. Ms. Bryant's doses of Metformin for September 21, 2015 are recorded as "missed" in the jail's computerized Medical Administration Records, and handwritten logs indicate "refused."   Defendant LPN Mathis noted Ms. Bryant's refusal to take her morning dose of Metformin.   No medication or treatment was offered to

Ms. Bryant for her known mental-health or hypertension issues on September 21, 2015.

49.    On September 22, 2015, Ms. Bryant refused both blood-glucose tests and both doses of Metformin, with Defendant LPN Mathis noting the morning refusal of medication.   Defendant LPN Mathis did not refer Ms. Bryant to a physician.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 22, 2015.

50.    On September 23, 2015, Ms. Bryant refused both blood-glucose tests and both doses of Metformin, with Defendant LPN Pearson noting Ms. Bryant's morning medication refusal and her refusal to report to sick call – for the "routine" appointment with a nurse.  No physician was notified, and no one followed up with Ms. Bryant regarding sick call.   No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 23, 2015.

51.    Also on September 23, 2015, at approximately the same time that Ms. Bryant purportedly refused her morning dose of Metformin and refused to report to sick call, Ms. Bryant's sister, Mildred Sims, visited with her at the jail. Following their visit, Ms. Sims spoke with jail personnel about Ms. Sims' concerns regarding Ms. Bryant's serious medical and mental-health conditions and her

history of medication non-compliance.  Jail personnel reassured Ms. Sims that Ms. Bryant would receive diabetes treatment, but further explained that mental health services and treatment would not be provided until Ms. Bryant had been detained or incarcerated in the jail for at least fourteen (14) days.

52.    On September 24, 2015, Ms. Bryant received neither her blood-glucose tests nor her Metformin.  Though the DOC Investigation File contains a refusal form for the evening medication and testing refusals, there are none from the morning of that day.  Ms. Bryant indicated on the evening medication refusal form that "I want the right medication."  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 24, 2015.

53.    On September 25, 2015, Ms. Bryant refused blood-glucose tests at 3:29 a.m. and 6:47 p.m.  Ms. Bryant declined to take her Metformin from Defendant LPN Mathis in the morning, and her evening dose was not provided (though it is not clear whether it was refused or whether an LPN (or which one) attempted to administer it).  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 25, 2015.

54.    On September 26, 2015, Ms. Bryant declined her Metformin from Defendant LPN Mathis in the morning and from Defendant LPN Moses in the

evening.  Jail records do not indicate whether Ms. Bryant was offered or given blood-glucose tests on September 26, 2015.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 26, 2015.

55.   On September 27, 2015, Ms. Bryant declined her Metformin from LPN Nickelberry in the morning and from Defendant LPN Moses in the evening. Jail records do not indicate whether Ms. Bryant was offered or given blood-glucose tests on September 27, 2015.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 27, 2015.

56.   On September 28, 2015, Ms. Bryant declined her Metformin from LPN Mitchell during the day, but took her evening dose.  Jail records do not indicate whether Ms. Bryant was offered or given blood-glucose tests on September 28, 2015.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 28, 2015.

57.   On September 29, 2015, Ms. Bryant declined her Metformin in the morning from LPN Gray and from Defendant LPN Haywood in the evening.  Jail records do not indicate whether Ms. Bryant was offered or given a blood-glucose test on the morning of September 29, 2015, though they reflect that she refused

blood-glucose testing that evening.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 29, 2015.

58.    On September 29, 2015, notes in the jail medical records for Ms. Bryant that indicate that morning and evening blood-sugar testing was to be discontinued that day, despite the original 90-day order and the dearth of any contradictory order.

59.    On September 30, 2015, Ms. Bryant declined her Metformin from Defendant LPN Mathis in the morning and Defendant LPN Moses in the evening. She further declined blood-glucose tests from Defendant LPN Haywood in the morning and Defendant LPN Smith in the evening.  No medication or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on September 30, 2015.

60.    On October 1, 2015, Ms. Bryant declined her Metformin from Defendant LPN Mathis in the morning and from Defendant LPN Glenn in the evening.  Per a written refusal form, Ms. Bryant purportedly declined blood-glucose testing on the evening of October 1, 2015; however, the jail's computerized medical records state that Defendant LPN Glenn administered a blood-glucose test in the morning and Defendant LPN Moses administered a

blood-glucose test in the evening of October 1, 2015.  No medication, testing or treatment was offered to Ms. Bryant for her known mental-health or hypertension issues on October 1, 2015.

61.    Also, on October 1, 2015, Ms. Bryant's 15-day prescription for Metformin expired.  The jail medical records indicate that her prescription was purportedly "fully administered."  There is no indication in the jail records that Ms. Bryant's decision not to take at least 90% of her prescribed Metformin was reported to any nurse supervisors, let alone to a physician, and she was never referred to a physician.  No one at the jail took any action to refill the prescription or obtain alternative diabetes medication or treatment for Ms. Bryant.

62.    On October 2, 2015, Ms. Bryant declined morning and evening blood-glucose tests.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no other treatment or testing was offered for any of her known, serious medical and mental-health conditions.

63.    On October 3, 2015, Ms. Bryant purportedly permitted a blood-glucose test in the morning, but declined the evening blood-glucose test, both by Defendant LPN Smith.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose

testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

64.    On October 4, 2015, per an electronic refusal form, Ms. Bryant refused a blood-glucose test to be administered by LPN Hill in the morning, but the computerized jail records indicate that the morning blood-glucose test was administered.  Consistent jail records reflect that Ms. Bryant refused to submit to a blood-glucose test by Defendant LPN Haywood in the evening on October 4, 2015. No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

65.    On October 5, 2015, Ms. Bryant refused morning blood-glucose testing from Defendant LPN Smith and evening blood-glucose testing from Defendant LPN Glenn.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

## C. Ms. Bryant was moved to a dark, unlit cell without supervisory approval or proper documentation.

66.    Also on October 5, 2015, Defendant Security Officer Bullard-Whitaker relocated Ms. Bryant from her fully functional, lit cell, 116, on the first

floor, minimum-security area of 4NW, to a dark, unlit cell, number 202, on the second-level, maximum-security area of 4NW, where the lights had not functioned for years.  Defendant Security Officer Bullard-Whitaker did not seek or obtain approval from a supervisor to move Ms. Bryant, in contravention of section 8.4.4 of SOP 200-11.

67.    That same day, Defendant Security Officer Fraser entered Ms. Bryant's cell move into the jail's electronic records via computer.  She neither obtained permission for the move nor recorded a reason for the move, in contravention of section 8.4.4 of SOP 200-11.

68.    Despite the written jail procedure forbidding such moves, the jail computer system allowed a non-supervisor to "approve" the move and did not require the entry of a reason for the move.

69.    No one acknowledged that the move had occurred in violation of purported written jail policy until after Ms. Bryant was found, dead and in full rigor, in unlit cell 202 eight (8) days later.  Ms. Bryant's health condition continued to deteriorate in cell 202.   Ms. Bryant suffered extreme pain, discomfort and mental anguish in cell 202, where she ultimately died, and Defendants were deliberately indifferent to Ms. Bryant's emergent mental and physical health condition while Ms. Bryant was in cell 202.

**D. The pattern of testing refusals – without referral to a physician – continued after the Metformin prescription expired, and no treatment was ever provided for Ms. Bryant's known, serious mental health issues.**

70.    On October 6, 2015, there is no record as to whether anyone offered to provide a blood-glucose test to Ms. Bryant in the morning, and none was administered.   That evening, LPN Hill administered a blood-glucose test to Ms. Bryant.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental health conditions.

71.    On October 7, 2015, Ms. Bryant declined blood-glucose tests from Defendant LPN Haywood in the morning and in the evening.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

72.    On October 8, 2015, Ms. Bryant declined blood-glucose tests in the morning from an unidentified LPN and in the evening from LPN Glenn.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

73.   On October 9, 2015, Ms. Bryant declined blood-glucose tests in the morning from Defendant LPN Smith and in the evening from an unidentified LPN. No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

74.   On October 10, 2015, Ms. Bryant declined blood-glucose tests in the morning and evening, both from Defendant LPN Smith.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

75.   On October 11, 2015, a refusal form indicates that Ms. Bryant declined a morning blood-glucose test from Defendant LPN Moses, though the jail's computerized medical records indicate, to the contrary, that the morning blood-glucose test was provided.  On the evening of October 11, 2015, Ms. Bryant declined a blood-glucose test from Defendant LPN Smith.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and, other than blood-glucose testing, no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

76.     On October 12, 2015, there is no indication that anyone at the jail offered, let alone administered, a morning or evening blood-glucose test to Ms. Bryant.  No medication was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

**E. Ms. Bryant stopped eating, became incoherent and remained unresponsive, in the same position on her bed, from at least lunchtime on October 12, 2015, but no one raised concerns about her mental or physical health for another day and a half.**

77.     Ms. Bryant did not eat her breakfast on October 12, 2015.  Ms. Bryant took her lunch tray to her bed that day.  But, to the lay person – an inmate or detainee – who delivered her lunch and returned to collect her tray, Ms. Bryant appeared to lack the strength to get up from her bed, where she was lying, without any clothes on, to return the food tray.  In addition, Ms. Bryant was mumbling unintelligibly when Defendant Security Officer Sanders and the other detainee helping with meal service attempted to collect the food tray at lunchtime on October 12, 2015.  Defendant Security Officer Sanders declined the offer of the detainee who was helping with the meal service to retrieve the tray from Ms. Bryant's cell because Ms. Bryant was unclothed.

78.     On October 13, 2015, there is no indication that anyone at the jail offered, let alone administered, a blood-glucose test to Ms. Bryant.  No medication

was offered to Ms. Bryant for her known diabetes, hypertension or mental health issues, and no testing or treatment was offered for any of her known, serious medical and mental-health conditions.

79.    On October 13, 2015, Ms. Bryant apparently never got out of her bed. Her breakfast was not touched, and she did not respond to questioning as to whether she was going to eat her breakfast.  The detainee who served Ms. Bryant her breakfast never saw Ms. Bryant because her cell was always dark.

80.    Jail personnel who looked into cell 202 on October 13, 2015 reported that Ms. Bryant was lying on top of her bed, unclothed, and unresponsive.  Many said that they believed she was sleeping.

81.    At around 9:30 a.m. on October 13, 2015, feces and water were discovered on the floor in front of cell 202 (Ms. Bryant's dark, unlit cell, following her unauthorized move) and cell 203, next door.  Per Defendant Security Officer Lieutenant Travis, there were feces and water on the floor in Ms. Bryant's cell.  No one, however, appears to have investigated whether Ms. Bryant had bowel issues or if she was physically ill.

82.    Defendant Security Officer Lieutenant Marnita Travis conducted her supervisor's round at 4NW at approximately 9:30 a.m. on October 13, 2015. Defendant Security Officer Lieutenant Travis claims to have seen Ms. Bryant

walking back and forth in her cell and mumbling something incoherent about the water and feces in her cell.  Lieutenant Travis is the only person who claims to have seen Ms. Bryant out of bed on October 12 or 13, 2015.  But Defendant Security Officer Lieutenant Travis apparently did not report Ms. Bryant's inability to coherently communicate to any of the medical, medical supervisory or jail supervisory personnel.

83.     Despite written policies requiring security checks at least once every 60 minutes (or every 30 minutes for maximum-security detainees, who were held in the same area as cell 202), the jail's video footage for October 13, 2015 reveals that no security checks of Ms. Bryant were made between 8:11 a.m. and 9:30 a.m., between 11:29 a.m. and 1:11 p.m., or between 1:12 p.m. and 2:21 p.m. Nonetheless, the security logs included falsified entries indicating that security checks were made during these times, including a total of eight (8) falsified entries. Defendant Corrections Officers Sanders and Bullard-Whitaker were on duty on October 13, 2015.

84.     On October 13, 2015, Ms. Bryant did not touch her lunch, and the detainee who delivered and removed the food tray reported that Ms. Bryant was lying on top of her bed, undressed, as she had been on October 12, 2015. Ms. Bryant did not respond to attempts to get her attention.

85.     A detainee assisting with meal delivery saved Ms. Bryant's lunch and reported to Defendant Security Officers Sanders and Bullard-Whitaker that Ms. Bryant had not touched her lunch.   Neither Defendant Security Officer Sanders nor Defendant Security Officer Bullard-Whitaker reported Ms. Bryant's continued failure to eat to any medical, medical supervisory, or jail supervisory personnel.   Nor did either of them conduct any further investigation as to Ms. Bryant's health or medical condition, nor report that Ms. Bryant had been unresponsive and lying in the same position all day to any medical, medical supervisory, or jail supervisory personnel.

86.     Defendant Security Officer Oscillia Adams worked the afternoon shift on 4NW on October 13, 2015.  Defendant Security Officer Adams reported that, as of 2:21 p.m., Ms. Bryant was lying on her back on her bed, without any clothes on. Defendant Officer Adams believes that Ms. Bryant may have jerked her leg when Officer Adams tapped on the door to cell 202 with her keys.

87.     Defendant Security Officer Adams further reported seeing Ms. Bryant in the same position, and not moving, at 3:50 p.m., 4:28 p.m. 5:22 p.m. 6:04 p.m., and again at 7:24 p.m., when Defendant Security Officers Adams and Sanders, along with Security Officer Green, finally realized that Ms. Bryant was completely non-responsive and her body was already stiff.

**F. Ms. Bryant had fallen into a diabetic coma and died several hours before the medical examiner arrived at around 8:00 p.m. on October 13, 2015.**

88.     The Fulton County Medical Examiner's office reported to the scene at approximately 8:00 p.m. on October 13, 2015, in less than an hour of being contacted.  The investigator reported that no one at the scene could tell her when Ms. Bryant was last known to be alive.  Ms. Bryant was lying on her back, in full rigor, and lividity was consistent with her position.

89.     There was dried emesis on the floor, on Ms. Bryant's face and on the sheet under her.  The cell floor was very sticky and smelled of urine.  Per the investigator, Ms. Bryant was found in full rigor that was very hard to break, and appeared to have been dead in her cell for hours.  The investigator further confirmed that Ms. Bryant was found in the dark in cell 202, in the portion of the floor where there were no lights.

90.     Jail personnel told the medical examiner's investigator that Ms. Bryant had mental issues, but no one could provide any additional medical information.

33

**G. Ms. Bryant died of diabetic ketoacidosis, but no one at the jail reported her obvious decline or sought medical attention, despite the fact that she had fallen unconscious, vomited, urinated and defecated uncontrollably, and had not spoken a coherent word for more than 24 hours.**

91.    An autopsy revealed that Ms. Bryant died from diabetic ketoacidosis. Testing revealed an elevated vitreous fluid glucose level of 495 mg/dL, a markedly elevated vitreous fluid beta-hydroxybutyrate level greater than 9 mmol/L, an elevated vitreous fluid potassium level of 9.7 mg/dL, and a markedly elevated blood hemoglobin $A_{1C}$ level of 16.1%.    Ms. Bryant further suffered from hypertensive cardiovascular disease and had a soft tissue hemorrhage and abscess on her right hip.

92.    Despite the knowledge of every single Defendant and the City that Ms. Bryant had serious physical medical and mental health conditions, Defendant Corrections Officers Bullard-Whitaker and Fraser sequestered Ms. Bryant to an unlit cell, making it difficult for anyone to readily see her, unlike the other detainees housed in lit cells, and no one at the jail bothered to correct the unauthorized move.  No one at the jail reported that Ms. Bryant had vomited at least twice prior to her death.  No one reported to the medical, medical supervisory or jail supervisory staff that Ms. Bryant had urinated and defecated on the floor of her cell.  No one reported to any medical or supervisory staff that Ms. Bryant was unable to communicate except via incoherent mumbling.  And no one followed up

to ensure Ms. Bryant's comfort, safety or health, despite that she had not eaten, left her bed – or even changed her position on it – or spoken a coherent word since the morning of October 12, 2015.

93.    The correctional officers and other employees of the City jail, including the Defendant Security Officers and the Defendant LPNs were directly aware of and personally observed Ms. Bryant's deteriorating health condition, including, but not limited to, her repeated refusals to take diabetes medication and submit to blood-glucose testing, and her inability, during the last approximately 48 hours of her life, to speak coherently or even get out of bed.  Moreover, had the Defendant Security Officers or LPNs performed even a minimal check of Ms. Bryant's dark cell 202, they would have seen that she had suffered from vomiting, uncontrolled urination and defecation, failure to eat, and that she lacked the ability to even get out of her bed following lunch on October 12, 2015, as described above.  During this time, these persons would, but for their deliberate indifference to Ms. Bryant's health, safety and life, have recognized that Ms. Bryant was extremely ill and needed immediate medical attention, including outside medical attention/hospitalization.  Yet no one sought any medical attention, and no physician saw Ms. Bryant from the time she entered the jail on September 14, 2015 until after her death, twenty-nine (29) days later.

94.     While at the jail, Ms. Bryant had a pattern of refusing diabetes medication, diabetes testing and insulin treatment.  Notwithstanding that the jail and its staff knew that Ms. Bryant had a history of mental illness, that her blood-glucose levels were extremely elevated, and her own requests for her medical records and treatment for schizophrenia while at the jail, no health care professional or mental health care professional saw or treated Ms. Bryant's known mental illness or hypertension at all.  And no one ever ensured that Ms. Bryant saw a physician, or was even referred to a physician, despite her repeated refusals of diabetes medication and testing.  No ketone test or $A_{1C}$ was ever ordered, let alone provided to Ms. Bryant while she was alive.  Ms. Bryant was never reasonably and properly examined or taken to a local hospital, such as Grady Hospital, even after she lapsed into unconsciousness.

95.     Defendants knew that the course of treatment for Ms. Bryant's serious medical condition of diabetes was largely, if not wholly, ineffective, and that no treatment whatsoever was provided for her known serious mental health conditions.  Yet Defendants did not have a mental health professional evaluate whether Ms. Bryant was capable of rational decision making in refusing testing and medication.  Instead, they left her in a dark, unlit cell, where she suffered and died alone and without any medical care.

96.     Defendants knew the medication provided to Ms. Bryant was not being taken and knew, or certainly would have known, had Ms. Bryant been in a cell where the lights worked, or had Defendants performed a reasonable inspection, that she lacked control of her bladder and bowels, that she vomited repeatedly hours before she died and that she spent much of her last 24-48 hours in the jail unconscious – likely in a diabetic coma.

97.     Between September 14 and October 13, 2015, and especially over the course of October 12-13, 2015, Ms. Bryant was suffering from increasingly dangerous symptoms, and in an obvious severely debilitating and deteriorating health condition, requiring qualified, reasonable medical attention (examination, diagnosis and treatment) by a physician, and likely in a hospital.   Before October 12, 2015, her diabetes and testing/medication refusals – especially when combined with the Defendants' knowledge of her serious mental health issues – gave the jail medical Defendants (including the Defendant LPNs and the Medical Supervisory Staff) objective and subjective knowledge that Ms. Bryant's health was in serious jeopardy, from the dangers of hyperglycemia and ketoacidosis.

98.     By October 12, 2015, Ms. Bryant's serious medical condition – lacking the ability to get out of her bed to return her food tray (and likely lapsing into a diabetic coma) – was obvious to even a lay person, including the other

detainees/inmates who assisted with meal service, and certainly should have been obvious to all Defendants, had anyone bothered to check on Ms. Bryant. Yet no Defendant took any action whatsoever to check on Ms. Bryant's medical condition or health.

### H. The City's policies and procedures demonstrated deliberate indifference to the health and life of Ms. Bryant and other detainees/inmates with serious medical and mental-health conditions.

99.     The Medical Supervisory Staff have vague, confusing and unclear policies regarding refusals of medication and other treatment. As one example, written directive 400-03, Pharmacy Operations/Pharmaceuticals, section 8.2.7, provides:

> Whenever a detainee refuses medication it will be documented on the Medication Administration Record (MAR) and Refusal form with witness signature including the date and time. NOTE: After two refusals nurse must refer to physician.

100. However, no referral procedure was identified, and none of the Defendant LPNs ever referred Ms. Bryant to a physician or brought her refusals to take Metformin (at least 27 of 30 doses) to the attention of a physician. None appeared to know how to do so. One Defendant LPN provided Ms. Bryant a "routine" sick-call referral to a nurse. Other Defendant LPNs assumed that the MAR or written refusal forms would be routinely reviewed by a physician, or that telling a supervisor nurse was sufficient to comply with the referral requirement.

101.   As the City of Atlanta applied this two-refusal policy, it was enforced, during its investigation following Ms. Bryant's death, only if Ms. Bryant refused medication twice or more from the same nurse.  Such a policy is unreasonable and makes no sense in providing adequate medical care – especially to someone with an uncontrolled chronic, serious condition like diabetes -- because a different nurse could be assigned to provide Ms. Bryant's (or any inmate's or detainee's) medication in the morning and evening of every day.   In fact, more than ten different LPNs saw Ms. Bryant over the course of her 29-day detention at the jail.

102.   Furthermore, it is unclear whether the jail's computerized Medical Administration Records could be, or, if so, if they were, checked by the various LPN Defendants.   At any rate, the actual policy that the City appears to have implemented is that "any detainee may refuse medication or medical treatment at any time, regardless of their mental capacity and regardless of whether the failure to administer the medication or treatment creates a serious danger to the health, safety or even the life, of the detainee."

103.   The City further failed to implement a policy or standard by which Healthcare Professionals were to evaluate the decision-making capacity of inmates or detainees who refuse medical care and medication.   Indeed, despite Ms. Bryant's known serious mental-health conditions of schizophrenia and bipolar

disorder, and despite her refusal to take approximately 90% of the Metformin prescribed for her known serious physical health issue of diabetes, there is no evidence that any professional ever questioned or evaluated her decision-making capacity.

104.   The City, despite knowing that approximately 15% of the detainees at its jail manifest a mental health disorder, maintains a policy of providing no mental health treatment or medication to any detainee until he or she has spent at least fourteen (14) days or more in the jail.   Other than her initial screening during intake, during which Ms. Bryant was classified as "mentally disordered," she received no mental health treatment or medication, despite pleas from both her and her sister to obtain her correct medication.

105.   The City failed to develop a diabetes protocol to provide an adequate medical treatment plan for the serious medical condition of diabetes.   Indeed, the City's policy manuals make merely a passing reference to diabetes as requiring chronic care in the form of monitoring of medications, laboratory testing, and use of chronic care clinics, and noting that "Professionally recognized chronic care guidelines are available from disease specific organizations and various medical and physical associates."   The City, however, appears to lack any written diabetes protocol, and it does not provide $A_{1C}$ testing or ketone testing, or the immediate

referral to a physician for blood-sugar readings above a certain level (recommended at >350 by the American Diabetes Association). Although the Medical Supervisory Staff and the Defendant LPNs all subjectively knew and understood that untreated diabetes could cause serious medical emergencies, the City failed to train its corrections/security and supervisory staff of the symptoms and dangers of serious diabetes health emergencies such as hypoglycemia, hyperglycemia and diabetic ketoacidosis.

106.   The City failed to develop or implement a protocol to follow up on refilling prescription medications provided to detainees like Ms. Bryant.

107.   Although the City has a written policy that purportedly requires consideration of the decision-making capacity of detainees or inmates who refuse medication or treatment, in practice, the City fosters a policy that allows any inmate or detainee to refuse medication or treatment without any consideration of the inmate or detainee's decision-making capacity, regardless of that inmate or detainee's mental-health status.

**COUNT I**
**Civil Rights Violation:**
**42 U.S.C. § 1983/Fourteenth Amendment –**
**Deliberate Indifference to Serious Medical Conditions**
**(Against all Defendants)**

108.   Plaintiff incorporates the facts from paragraphs 1-107 above by reference.

109.   As of September 14, 2015, up through the date her death was discovered, October 13, 2015, Ms. Bryant was detained at the Atlanta City Jail and under the custody and control of the City of Atlanta and various City of Atlanta employees, including the named individual Defendants.  Furthermore, Ms. Bryant, as a City of Atlanta detainee at the jail, had no access to medical care other than that provided by the jail.

110.   As described above, the Defendants, who at all times acted under color of state law, intentionally denied Ms. Bryant necessary medical care and/or their conduct indicated deliberate indifference to her serious medical needs, constituting cruel and unusual punishment in violation of her rights under the Eighth Amendment, as enforced through the Fourteenth Amendment (for detainees), of the United States Constitution.

111.   Ms. Bryant had serious medical needs, including diabetes, schizophrenia and bipolar disorder, that were recognized, both objectively and

subjectively, by the jail's medical personnel, including the Defendant LPNs and the Medical Supervisory Staff, and other City Jail Defendants.

112.   Ms. Bryant further, by no later than October 12, 2015, had a serious medical need, in that her medical need was so obvious that even a lay person (*e.g.*, the other detainees/inmates who served her meals) easily recognized the necessity for immediate medical attention.

113.   Defendants' acts and omissions described above were all committed under color of state law and were directly and exceedingly harmful to Ms. Bryant, evidencing deliberate indifference to her serious medical needs and offending the standards of decency in violation of the Fourteenth Amendment.

114.   Ms. Bryant was placed into a dark cell, alone, where she suffered and was allowed to deteriorate over days, evidencing Defendants were obdurate and wanton in their acts/omissions as to Ms. Bryant's serious medical needs, in that Defendants ignored and/or failed to address her serious medical needs.

115.   Defendants knew that Ms. Bryant had urgent medical needs that would be significantly exacerbated by delay and they did delay, and otherwise failed to provide urgent medical care.

116.   Defendants had knowledge of Ms. Bryant's need for medical care and intentionally refused to provide that care and/or otherwise provided her with

medical care that was so grossly incompetent or inadequate, amounting to no treatment at all, as to shock the conscience or to be intolerable to fundamental fairness.

117.   Defendants Dr. Scott, Nurses Brawner and Mitchell, and LPNs Mathis, Moses, Pearson, Haywood, Smith, and Glenn (the "Jail Medical Personnel") failed to respond to, delayed in responding to, and/or provided grossly inadequate care for Ms. Bryant's serious medical needs, including the need to provide treatment for her severe medical conditions of diabetes, hypertension, and mental illnesses that were known to them from September 14, 2015 onward, particularly when Ms. Bryant's initial blood-sugar level was 353.  Moreover, the Jail Medical Personnel wholly ignored the final manifestation of diabetic ketoacidosis that were evidenced by Ms. Bryant's obvious and extremely debilitating symptoms, including vomiting; the inability to eat, to get out of bed, or to communicate coherently; urinating and defecating uncontrollably, and other symptoms of a severe medical condition, including loss of consciousness (likely a diabetic coma from the onset of ketoacidosis).

118.   The Jail Medical Personnel all knew, both objectively and subjectively, that diabetic ketoacidosis presented a medical emergency that was a known risk that could manifest from uncontrolled diabetes and that the failure to

maintain a proper blood-glucose level and to take prescribed diabetes medication increased the risk of ketoacidosis for diabetic detainees like Ms. Bryant.

119.   The Jail Medical Personnel were further deliberately indifferent to Ms. Bryant's serious medical needs in that, in spite of their direct knowledge of her repeated refusals of blood-glucose testing and Metformin medication, as set forth above:

(a)   they violated a clear and specific standard, and similarly situated reasonable health care providers would have known their actions violated Ms. Bryant's Constitutional rights;

(b)   they took an easier and less efficacious course of treatment – i.e., none – than obtaining medical assistance for her serious medical condition via court order;

(c)   they took an easier and less efficacious course of treatment – again, none – than obtaining medical assistance for her serious medical condition of diabetic ketoacidosis from a hospital;

(d)   they provided medication which was cursory and insufficient and routinely allowed Ms. Bryant to refuse even that treatment without ever referring her to a physician;

(e)     they did not do anything to evaluate Ms. Bryant's mental capacity to refuse diabetic testing and medication;

(f)     they did nothing to treat, or even evaluate, Ms. Bryant's known serious mental-health issues; and/or

(g)     they did not do anything to further a medical diagnosis for or provide any treatment of Ms. Bryant's serious medical condition, even during the last 24-48 hours of her life, as she lapsed into diabetic ketoacidosis as she deteriorated, vomited, lost the ability to eat and to communicate, lost control of her bladder and bowels, and became unconscious.

120. All Defendants, including, without limitation, the Defendant Corrections Officers, were also deliberately indifferent to Ms. Bryant's serious medical needs in that:

(a)     Ms. Bryant's need for medical treatment was obvious even to a layperson, and no medical care was provided, or even offered, on October 12-13, 2015, when Ms. Bryant was too weak to get out of bed, lost the ability to speak coherently, vomited, lost control of her bladder and bowels, and lapsed into unconsciousness; and/or

(b)    Ms. Bryant's access to medical care was delayed to the extent that it was tantamount to unnecessary and wanton infliction of pain, permanent injury and death.

121.   The Defendants, with knowledge of Ms. Bryant's urgent need for medical attention, failed to provide care or treatment, delayed care or treatment, or provided grossly inadequate care or treatment, needlessly causing extreme suffering and her eventual death.

122.   Defendants allowed Ms. Bryant to suffer over days and weeks, even as her condition was deteriorating.

123.   Given the seriousness of Ms. Bryant's known physical and mental conditions, and the extent of the pain, suffering and deterioration faced by Ms. Bryant during her twenty-nine (29) days at the jail, as demonstrated by the facts stated above, Defendants were directly and subjectively aware of a substantial risk of serious harm to Ms. Bryant's health and medical welfare, but knowingly disregarded that risk, evidencing more than gross negligence.

124.   Defendants engaged in risky conduct as to the care and treatment (or lack thereof) afforded Ms. Bryant and knowingly provided grossly inadequate, and at times no care to Ms. Bryant.

125.   Defendants Dr. Scott and Nurses Brawner and Mitchell, as the Medical Supervisory Staff, had supervisory authority over delivery of medical care in the Atlanta City Jail and failed to establish appropriate protocols for evaluation and treatment of physically ill prisoners, such as Ms. Bryant, and such failure caused or contributed to Ms. Bryant's suffering, deterioration and death.

126.   Ms. Bryant had a Constitutional right to adequate health care, including the provision of onsite medical care along with referrals to community and hospital healthcare providers as necessary, and the provision of healthcare pursuant to court order or due to medical emergency, but Ms. Bryant was denied this right, causing her to suffer and deteriorate, both physically and mentally, eventually resulting in her death.

127.   Ms. Bryant had the Constitutional right to be able to make her medical problems known.  Ms. Bryant was denied this right by being unduly confined to a dark, unmonitored isolation cell and being denied access to on-duty, on-call medical personnel, causing her to suffer and deteriorate, both physically and mentally, eventually resulting in her death.

128.   Ms. Bryant had the Constitutional right to access care for any condition, if the denial of care might result in pain, suffering, deterioration or

degeneration.  Ms. Bryant was denied her right to care, and the denial of her right to care resulted in her suffering, deterioration, degeneration and death.

129.  Ms. Bryant had a Constitutional right to access competent medical staff to examine inmates to diagnose and provide adequate treatment for her illnesses, and to evaluate her mental competency to refuse treatment or testing. Ms. Bryant was denied these rights in that Defendants the Jail Medical Personnel were not competent, and the policies and procedures or customs of the City of Atlanta failed to ensure or even check their competency.  Defendants the Jail Medical Personnel failed to treat Ms. Bryant's obvious serious medical conditions of diabetic hyperglycemia and, eventually, diabetic ketoacidosis, causing Ms. Bryant to suffer extreme pain and deterioration, both physically and mentally, eventually resulting in her death.

130.  Ms. Bryant had a Constitutional right to access to medical staff able to treat detainees' problems or to refer them to outside medical services who can (*e.g.*, Grady Hospital), and Ms. Bryant was denied this right in that the Jail Medical Personnel were unable or unwilling to treat her serious medical conditions, and failed to or refused to refer her to outside medical services.

131.  Ms. Bryant had a Constitutional right to treatment in a location conducive to medical functions, but Ms. Bryant was denied this right by the lack of

an adequate infirmary or any referral to a physician, by confinement in a dark, unmonitored, unsanitary isolation cell while suffering serious medical and mental health conditions, all of which caused Ms. Bryant to suffer extreme pain and deterioration, both physically and mentally, eventually resulting in her death.

132.   Defendants failed to meet Ms. Bryant's ordinary and normal health needs, including monitoring of her mental competency to refuse testing or medication, treatment for relief of pain and suffering and prevention of deterioration, degeneration and death.

133.   Defendants' said acts and omissions caused Ms. Bryant physical and mental torture and a lingering death, in violation of the Fourteenth Amendment.

134.   In addition to Defendants' foregoing violations of Ms. Bryant's Fourteenth Amendment rights, her Constitutional rights were also violated in the following particulars:

(a)   Defendants failed to provide Ms. Bryant any mental-health treatment whatsoever, despite her known history of schizophrenia and bipolar depression, her pleas to obtain her medical records and the correct medication, her sister's pleas to provide medication and treatment, and her repeated refusals, without any evaluation of her decision-

making capacity, to take Metformin or have her blood-glucose levels tested.

(b)    Defendant LPNs Mathis, Moses, Pearson, Haywood, Smith and Glenn's repeatedly failed to evaluate Ms. Bryant's decision-making capacity or refer her to a mental-health professional who could properly evaluate her decision-making capacity when she refused blood-glucose testing and medication, as well as their repeated failures to refer Ms. Bryant to a physician when she refused most all diabetic testing and medication;

(c)    The Medical Supervisory Staff and Defendant LPNs failed to seek renewal of Ms. Bryant's expired Metformin prescription or to obtain alternative diabetes treatment, and the Medical Supervisory Staff failed to implement policies or procedures to provide for prescription renewals;

(d)    The Medical Supervisory Staff failed to review the electronic Medical Administration Records (or "MAR") or hard copy medication/ treatment refusals for Ms. Bryant or to take appropriate action if they did review the MAR or hard copy refusal forms;

51

(e)     The Medical Supervisory Staff failed to develop and implement a proper diabetic treatment protocol for detainees and inmates, including the failure to train the Defendant LPNs and the other correctional and security staff to monitor for symptoms of the emergency medical conditions of diabetic hyperglycemia and ketoacidosis;

(f)     Defendant Security Officer Bullard-Whitaker moved Ms. Bryant, without authorization from a supervisor, from cell 116, which had fully functioning lights, into cell 202, where the lights had not worked for years, and Defendant Security Officer Fraser entered the move into the jail computer system.   Notwithstanding Ms. Bryant was wrongfully and unnecessarily isolated in darkness, neither the corrections officers nor Jail Medical Personnel took reasonable steps to adequately view Ms. Bryant, let alone monitor her serious medical and mental-health conditions;

(g)     Defendants Chief Labat and Major LeCounte, who were responsible for all jail policies and procedures, failed to implement a computer system that required supervisory approval for moving inmates and detainees or that required reasons for any move to be entered, and

instead, implemented a procedure that allowed security officers to move inmates and detainees on their own initiative and with impunity;

(h)     No Defendant followed up when Ms. Bryant missed sick call the only time she was referred to sick call (albeit for a "routine" appointment to see a nurse); no one re-scheduled the appointment or checked up on Ms. Bryant's physical or mental health;

(i)     Defendants forced Ms. Bryant to lie in her own vomit, i.e., on a soiled mattress and in a soiled cell, for many hours, including overnight, before discovering her death on the evening of October 13, 2015;

(j)     Defendant Security Officers Lt. Travis, Bullard-Whitaker, Sanders and Adams' failures on or about October 12-13, 2015 to check on Ms. Bryant's well-being or to obtain any medical assistance, particularly following Ms. Bryant's failure to eat any meal following lunch on October 12, 2015, her inability to get out of bed, and remaining in the same position and likely unconscious for more than 24 hours; and

(k)     Defendant Security Officer Sanders entered security rounds in the logs that she did not actually conduct of cell 202, 4NW, on October 13, 2015.

135.   Defendants' said acts and omissions (identified in the preceding numbered paragraphs), constituting deliberate indifference, produced and inflicted physical and emotional injury and pain right up until the time of Ms. Bryant's death, constituting cruel and unusual treatment, in violation of her civil rights and the Fourteenth Amendment to the United States Constitution.

136.   Defendants' violations of Ms. Bryant's Fourteenth Amendment rights, as set forth above, were a direct and proximate cause of Ms. Bryant's undue and extreme pain, suffering, deterioration, both mental and physical, and her ultimate death, for which Plaintiff Mildred Sims is entitled to recover as the Personal Representative of her sister Wickie K. Bryant's estate.

137.   The City of Atlanta's policies or customs, as detailed above, were a moving force behind the deprivations of Ms. Bryant's Constitutional rights.

**COUNT II**
**Civil Rights Violation:**
**42 U.S.C. § 1983/Fourteenth Amendment –**
**Failure to Train/Inadequate Training**
**(Against Defendants Chief Labat, Major LeCounte, and the Medical**
**Supervisory Staff, Dr. Scott and Nurses Brawner and Mitchell)**

138.   Plaintiff incorporates the facts from paragraphs 1-107 above by reference.

139.   Defendant Chief Labat is responsible for the overall operation and direction of the Atlanta City Detention Center, and Defendant Major LeCounte

oversees the division responsible for the security and care of persons arrested in the City of Atlanta who are awaiting pretrial court proceedings or trial, like Ms. Bryant.

140. Defendant Dr. Scott is responsible for the delivery and coordination of healthcare services at the Atlanta City Detention Center. Defendant Dr. Scott's responsibilities include developing mechanisms to assure that the scope of medical services is provided and properly monitored, developing, along with the Director of Nursing, Defendant Nurse Brawner, the jail's operational health policies and procedures and establishing systems for the coordination of care among multidisciplinary health care providers.

141. Defendant Nurse Mitchell was, at all relevant times, Nursing Supervisor and the administrator of the Atlanta City Detention Center's electronic health system called "CorrecTek." Defendant Nurse Mitchell was responsible for supervising the nurses in the Medical Unit and administering the electronic health system.

142. The Medical Supervisory Personnel Defendants, Chief Labat and Major LeCounte failed to train and ensure the training of the medical staff in the following respects:

(a)    They failed to adequately train the nurses and LPNs working at the jail how to apply the "two-refusal referral policy," requiring referral to a physician following two medication refusals. None of the Defendant LPNs, nor any other nurse at the jail, ever referred Ms. Bryant to a physician or brought her refusals to take Metformin (at least 27 of 30 doses) to the attention of a physician. As noted above, none of the Defendant LPNs appeared to know how to do so.

(b)    The two-refusal policy was enforced, during the City's investigation following Ms. Bryant's death, only if Ms. Bryant refused medication twice or more from the same nurse, demonstrating that the City failed to train its jail medical personnel to review prior medication history and/or that the policy is not designed to ensure adequate medical care.

(c)    They trained medical personnel that "any detainee may refuse medication or medical treatment at any time, regardless of their mental capacity and regardless of whether the failure to administer the medication or treatment creates a serious danger to the health, safety or even the life, of the detainee."

(d)     They further failed to train healthcare professionals to evaluate or refer detainees or inmates to the correct healthcare professionals to evaluate the decision-making capacity of inmates or detainees who refuse medical care and medication.

(e)     They failed to develop a diabetes protocol and/or train their healthcare professionals to provide an adequate medical treatment plan for the serious medical condition of diabetes.  The City's policy manuals make merely a passing reference to diabetes as requiring chronic care in the form of monitoring of medications, laboratory testing, and use of chronic care clinics, and noting that "Professionally recognized chronic care guidelines are available from disease specific organizations and various medical and physical associates."  Indeed, as further evidence of a recurring constitutional issue of deliberate indifference to the serious medical condition of diabetes, in 2014, a diabetic inmate at the Atlanta City Detention Center attempted to sue the City when he suffered permanent injuries due to the jail's failure to monitor and regulate his insulin levels.  *See City of Atlanta v. Mitcham*, 296 Ga. 576 (2015).

(f)     They failed to train its corrections/security and supervisory staff of the symptoms and dangers of serious diabetes health emergencies such as hypoglycemia, hyperglycemia and diabetic ketoacidosis, or to obtain emergency medical attention for detainees/inmates who vomit, cannot get out of bed or communicate, fall unconscious, or urinate/ defecate uncontrollably.

(g)     They failed to train the correctional staff to recognize, evaluate, and respond appropriately to serious medical conditions.

143.   These failures to train represented official City policy, and such policy was the moving force behind the deliberate indifference to Ms. Bryant's serious medical needs, in violation of Ms. Bryant's constitutional rights under the Fourteenth Amendment.

144.   Ms. Bryant has demonstrated a pattern of similar constitutional violations that would put the City on notice of its inadequate training.

145.   Even if the deliberate indifference shown to Ms. Bryant's serious medical needs of diabetes and, eventually, hyperglycemia, ketoacidosis and death, was a single civil rights violation, it demonstrates that the City has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.  The American Diabetes Association estimates that, as of 2002,

approximately 4.8% of incarcerated persons, or approximately 80,000 inmates in the United States, had diabetes.  And the City itself estimates that 15% of its detainees suffer from mental health issues.

146.   In her capacity as the Personal Representative of her sister's estate, Mildred Sims is also entitled to recover, on behalf of Wickie Yvonne Bryant's estate, for her funeral expenses, for her pain and suffering, both physical and mental, and all other damages recoverable under applicable law.

## COUNT III
## Punitive Damages

147.   Plaintiff incorporates the facts from paragraphs 1-107 above by reference.

148.   The Defendants' conduct, as described above, evidences intentional actions, or, at the very least, a conscious and deliberate indifference to Ms. Bryant's medical needs, such that Plaintiff is entitled to an award of punitive damages.

149.   The Defendants' conduct, as described above, evidences willful misconduct, malice, wantonness, oppression, or that entire want of care that would raise the presumption of a conscious indifference to consequences, entitling Plaintiff to an award of punitive damages under O.C.G.A. § 51-12-5.1 and any other applicable law.

## COUNT IV
## Attorneys' Fees and Costs Under 42 U.S.C. § 1988

150.   Plaintiff incorporates the facts from paragraphs 1-107 above by reference.

151.   Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover costs, including reasonable attorney and expert fees in litigation that successfully vindicates the civil rights of her sister.

WHEREFORE, Plaintiff Mildred Sims, as Personal Representative of the Estate of her sister, Wickie Yvonne Bryant, prays that:

(a)    This Complaint be filed, Summonses issued and service effected in accordance with law;

(b)    As the Personal Representative of the Estate of her sister, that she have and recover for her civil rights claim under 42 U.S.C. § 1983, damages from Defendants based on the evidence and awarded in the enlightened conscience of the jury;

(c)    As the Personal Representative of the Estate of Wickie Yvonne Bryant, that she have and recover from Defendants general damages for Ms. Bryant's pain and suffering, and special damages for medical, funeral and other expenses recoverable pursuant to O.C.G.A. § 51-4-5 and federal law;

(d)     That Plaintiff be awarded costs of this action, including attorney's fees and expert costs, as permitted by applicable law, including 42 U.S.C. § 1988;

(e)     That Plaintiff be awarded punitive damages against the Defendants, pursuant to O.C.G.A. § 51-12-5.1; and

(f)     That Plaintiff be awarded such other and further relief as this Court deems necessary, proper, and just.

Plaintiff demands a trial by jury of all issues so triable.


Dated:  February 10, 2017.


                                            Respectfully submitted,

                                            */s/ Michael J. Blakely, Jr.*
                                            **Jay F. Hirsch**
                                            Georgia Bar No. 357185
                                            **N. Kirkland Pope**
                                            Georgia Bar No. 584255
                                            **Kimberly J. Johnson**
                                            Georgia Bar No. 687678
                                            **Michael J. Blakely, Jr.**
                                            Georgia Bar No. 708906
                                            POPE, McGLAMRY, KILPATRICK,
                                            MORRISON & NORWOOD, P.C.
                                            3391 Peachtree Road, N.E., Suite 300
                                            P.O. Box 191625 (31119-1625)
                                            Atlanta, GA  30326
                                            (404) 523-7706
                                            Fax (404) 524-1648
                                            efile@pmkm.com

**Stephen R. Fowler**
Georgia Bar No. 464407
The Fowler Firm, LLC
1800 Peachtree Street, Suite 809
Atlanta, GA  30309
(404) 574-2205
Fax (404) 574-1518
stephen@fowlerfirmlaw.com

ATTORNEYS FOR PLAINTIFF